IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**MEL HARRISON**,

      **Plaintiff**

VS.                                 CASE NO. _____

**STRYKER CORPORATION;**
**STRYKER SALES CORPORATION;**
**and HOWMEDICA OSTEONICS**
**CORP. D/B/A STRYKER**

## PLAINTIFF'S ORIGINAL COMPLAINT

### Statement of the Parties

1.      Plaintiff Mel Harrison (hereinafter "Plaintiff") is a citizen and resident of Montgomery County, Texas, and is over the age of nineteen.

2.      Defendant Stryker Corporation (hereinafter "Defendant Stryker") is believed to be a foreign corporation organized under the laws of the Michigan with its principal place of business in Kalamazoo, Michigan. Defendant Stryker may be served with process by serving its registered agent for service, Dean H. Bergy, 2825 Airview Blvd., Portage, Michigan 49002. Defendant Stryker has sufficient contacts with the State of Texas to give the Court jurisdiction over Defendant Stryker.

3.      Defendant Stryker Sales Corporation (hereinafter "Defendant Stryker Sales") is a foreign corporation organized under the laws of Michigan with its principal place of business located in Kalamazoo, Michigan. Said defendant is authorized to conduct business in the State of Texas and may be served with process by serving its registered agent, C T Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201.

1

4        Defendant Howmedica Osteonics Corp. d/b/a Stryker Orthopedics (hereinafter "Defendant Stryker Orthopedics") is a foreign corporation organized under the laws of New Jersey with its principal place of business located in Mahwah, New Jersey. Said defendant is authorized to conduct business in the State of Texas and may be served with process by serving its registered agent, C T Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201.

5        Defendant Stryker, Defendant Stryker Sales, and Defendant Stryker Orthopedics shall hereinafter be referred to, jointly and severally, as Defendant.

## Jurisdiction

This Court possesses Federal Diversity Jurisdiction under 28 U.S.C. § 1332(a) because the matter in controversy:

(a)     exceeds the sum or value of $75,000.00, exclusive of interest and costs; and

(b)     is between citizens of different states.

## Venue

This Court possesses venue of this civil action under 28 U.S.C. § 1391(a) because:

(a)     jurisdiction of this civil action is founded only on diversity of jurisdiction; and

(b)     is a judicial district:

(l) where any Defendant resides, and all Defendants reside in the State of Texas.

## Statement of Facts Applicable to All County

6        Plaintiff hereby adopts and realleges each and every Paragraph of the Statement of Parties of this Complaint.  Mel Harrison is a 44-year old, Corrections Officer in a private prison for the Geo Group, located in Conroe Texas.  He escort inmates, monitor the inmates, inspect

2

dorms with 30 individuals.  He works long-hard hours, which he was happy to do until his body started to fail him.  A short-time ago he started experiencing intolerable pain in his Left hip.  This pain caused difficulty walking and constant discomfort; which, started to impede his ability to perform his duties as a corrections officer.  While working as a corrections officer, directly with inmates, it is imperative that he be confident in his ability to react and defend himself and others at ALL times.   As the pain continued to worsen Mel became worried about his safety.

7.      And after realizing that pain medication would not remedy his problem, he finally went to consult his doctor.  It was thereafter determined that he had severe left hip degenerative joint disease.  He consulted with his Doctor and they decided that hip-replacement surgery was his best option for pain relief and stability.

8.      On or about November 29, 2010, Dr. Brian Thomas Chimenti at Memorial Herman Hospital, Woodlands Hospital performed a left hip arthroplasty on Plaintiff. During such surgery, a hip implant believed to be designed, manufactured and marketed by Defendants was implanted into Plaintiff's left hip. Such hip implant is identified as follows:

Stryker, Alumina Ceramic V40™ Femoral Head, 36mm, Ref, Lot.

| | |
|---|---|
| Manufacturer: | HOW/OST |
| Device: | Trident ®PSL® HA, Cluster Acetabular Shell, 58mm |
| Ref#: | 542-11-58G |
| Lot#: | MJM3DG |

| | |
|---|---|
| Manufacturer: | HOW/OST |
| Device: | Trident®, Alumina Ceramic Acetabular Insert. 36mm |
| Ref#: | Ref-625-OT-36G |
| Lot #: | 34688501 |

| | |
|---|---|
| Manufacturer: | HOW/OST |
| Device: | Meridian®TMZF®, 132° Neck Angle V40™ Hip Stem, Size #5 |
| Catalog #: | 3265-1-011 |
| Case Code #: | 33818802 |

| | |
|---|---|
| Manufacturer: | Stryker Orthopedics |
| Device: | Stryker, Alumina Ceramic V40™ Femoral Head, 36mm |
| Ref #: | 6565-0-036 |
| Lot #: | 34120503 |

9.      Despite following all of his surgeon's instructions after his surgery including rehabilitative programs, Plaintiff began to experience incrementally increasing levels of pain in his left hip.

10.     On or about December 2, 2010, Plaintiff woke-up in that middle of the night to excruciating pain Mr. Harrisons hip popped out causing extreme pain and panic. Mr. Harrison watched his leg dangle thinking he may be paralyzed.  Mr. Harrison feeling the most unstable he has ever felt in his life braced himself as his wife called 9-1-1.

11.     After spending the entire day in the hospital having the hip reset and making the decision to postpone physical therapy. Mr. Harrison returned home only to have his hip dislocate a second time.   Again Mr. Harrison was rushed back to the hospital to have the hip reset.

12.     After attempting to heal physically, mentally and emotionally from the previous dislocations.   On December 16, 2011, Mel was sitting at the computer in his bedroom and it happened for the third time, his hip dislocated.  He was rushed the emergency room for the third time.

13.     During his follow-up appointment with his surgeon, Mr. Harrison was advised that advised that acetabular components used in his surgery were defective and his surgeon recommended a revision surgery.

14.     The months to follow would prove almost unbearable.  Mr. Harrison was instructed to stay in bed, try to avoid any movement.  Mr. Harrison became paranoid and depressed, thinking he would not be able to walk normally again.  He worried that he would not be able to be independent.   He experience extreme mental anguish for which he was medicated.

15.     Between November 29, 2010 and January 3, 2011, Mr. Harrison had three (3) dislocations and Finally Total Revision Hip Replacement Surgery.

16.     During each dislocation Mr. Harrison had to be rushed to the emergency room.

17.     Due to the failure of the Stryker Total hip components, Plaintiff has suffered and continues to suffer from extreme pain and discomfort in and around her left hip.

18.     Defendants were in the business of designing, manufacturing, marketing and selling hip prostheses including the Trident acetabular cup implanted into Plaintiff on November 29, 2010.

19.     Defendants sold the subject Trident acetabular cup and Trident System to Plaintiff, or to her physicians on her behalf.

20.     Defendants obtained approval from the United States Food and Drug Administration (FDA) to market the Trident Hemispherical acetabular cup with polyethylene liner under the abbreviated premarket notification process commonly referred to as 510(k) process.

21.    Trident acetabular shells were formerly called Osteonics Secur-Fit AD, were commercially available and in use prior to the FDA's approval of the ceramic weight bearing components. The Trident acetabular shells, formerly called Osteonics Secur-Fit AD, were approved by the FDA through the 510(k) process on or about December 11, 1998. Thereafter, a second generation identified in FDA documents as Trident hemispherical acetabular shells, AD and AD-HA were approved through the 510(k) process on or about December 5, 2001.

22.    On or about March 15, 2007, (well before Defendant Stryker finally initiated a recall of its defective Trident acetabular shells on January 22, 2008), the FDA issued a Warning letter to Defendant arising from its inspections of Defendant's Cork, Ireland facilities between October 31,

2006 and November 3, 2006. The FDA investigation revealed that Defendant's Trident Acetabular System were adulterated within the meaning of section 21 U.S.C. § 351(h) in that "the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation were not in conformity with the Current Good Manufacturing Practice (CGMP) requirements of the Quality System (QS) regulation found at Title 21, Code of Federal Relations (C.F.R.), Part 820.

23.     Prior to this warning letter, the FDA inspector issues to Defendant Stryker a Form FDA 483, List of Inspectional Observations, that identified the following violations:

     a.     Failure to establish and maintain adequate procedures for implementing a corrective and preventative action, as required by 21 CFR 820.100(a) which included insufficient dwell time, nonconforming temperature, pressure variation and burst test method variability;

     b.     Failure to establish and maintain adequate procedures to control product that fails to conform with specified requirements, including the evaluation of nonconforming products, as required by 21 C.F.R. 820.90(a);

     c.     Failure to timely making changes to procedures to lessen confusion and better assure that root causes of non-conforming product are identified;

     d.     Failure to manufacture blister sealing used for sterilized products according to the federal requirements in that the blister sealing temperature, time and pressure settings were outside of the specified and validated operating parameters;

     e.     Failure to establish and maintain adequate procedures to implement and record changes in methods and procedures needed to correct and prevent identified quality problems, as required by 21 CFR 820.100(a)(5) including failing to verify and implement changes to reduce the Final Rinse Tank bioburden;

     f.     Failure to establish and maintain adequate procedures for rework, to include retesting and reevaluation of the nonconforming product after rework, to ensure that the product meets its current approved specifications, as required by 21 CFR 820.90(b)(2).

24.     On January 22, 2008, Defendant initiated a recall of certain Trident PSL and Hemispherical Shells manufactured in their Cork, Ireland facilities which included Plaintiff's specific hip device. The recall included Trident PSL and Hemispherical Shells manufactured by Defendant at the Cork, Ireland facility between January 2000 through the end of December 2007. This recall came after an investigation into deviations between specifications and processes for manufacturing required by the FDA whereby, among other failures, excessive bioburden, viable microorganisms, were found in the final rinse tank thereby contaminating the devices and excessive manufacturing residuals in excess of those permitted by the FDA were found on the Trident devices. Residuals are not an acceptable part of the manufacturing process for any hip device and are direct evidence of an adultered device as defined by the applicable federal regulations. To date, Plaintiff has been unable to determine whether the residuals were foreign bodies or native material from the manufacturing as no public information is available except for a redacted FDA warning letter detailed herein below.

25.     Federal regulation states "Recall means a firm's removal or correction of a marketed product that the Food and Drug Administration considers to be in violation of the laws it administers and against which the agency would initiate legal action, e.g. seizure." See 21 CFR §7.3(g).

26.     Recall is an effective method of removing or correcting consumer products that are in violation of laws administered by the Food and Drug Administration. Recall is a voluntary action that takes place because manufacturers and distributors carry out their responsibility to protect the public health and well-being from products that present a risk of injury or gross deception or are otherwise defective. These sections also recognize that recall is an alternative to FDA initiated court action for removing or correcting violative, distributed products by setting forth specific recall

7

procedures for the Food and Drug Administration to monitor recalls and assess the adequacy of a firm's efforts in recall." 21 CFR §7.40(a).

21.     The cup implanted into Plaintiff's body should have been included in the recall. According to publicly available information on the FDA website, the recall included all lots of the Trident Hemispherical Acetabular Shells.

22.     Notwithstanding the inability to farther define the residues left on the acetabular cup, orthopedic surgeons have expressed the opinion that residues coat the back of the acetabular cup and prevent boney ingrowth. This prevents the cup from being securely held into the socket which results in a loose cup. Residues present on Plaintiff's loosened Trident acetabular cup, in all probability, caused its loosening and necessitated revision. By recalling the Trident acetabular cup, Stryker admitted the cup was manufactured in violation of federal regulations and requirements. These violations of federal regulations including making an adulterated device that proximately caused Plaintiffs injuries and damages.

23.     The hip prostheses reached Plaintiff without substantial change from the time it left Defendants' possession and control.

<u>COUNT ONE</u>

For strict liability cause of action against Defendants, Plaintiff says:

1.     Plaintiff adopts by reference each and every Paragraph of the Statement of Facts Applicable to All Counts of this Complaint as if fully copied and set forth at length herein.

2.     The hip prosthesis contained a manufacturing, or marketing defect, more particularly set forth below.

3. The Trident acetabular cup contained a manufacturing defect in that it was adulterated as a result of being manufactured in violation of FDA regulations and requirements, as set forth below, such that manufacturing residuals remained on the prosthesis after its manufacture:

       a.    failing to ensure the quality policy is understood, implemented and maintained at all levels of the organization, 21 C.F.R. §820.20(a);

       b.    failing to provide adequate resources, including trained personnel, for management, performance of work and assessment activities, including internal quality audits necessary to comply with the federal regulations as required by 21 C.F.R. §820.20(b)(2); and

       c.    failing to establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be anticipated to have an adverse effect on product quality as required by 21 C.F.R. §820.70(e).

4.    The Trident acetabular cup deviated, in its construction or quality, from the specifications or planned output in that the manufacturing residuals that remained on the cup coated the back and impaired boney ingrowth. This proximately caused Plaintiffs acetabular cup to become loose necessitating revision surgery.

## _Marketing Defect_

5.    The hip prostheses contained one or more marketing defects, among others:

    (a)    Defendants failed to warn Plaintiff or her physicians (or to adequately warn Plaintiff or his physicians of the above risk), that the hip prosthesis contained residuals that would prevent boney ingrowth and could cause infection and/or loosening that would necessitate subsequent surgeries;

    (b)    Defendants failed to warn Plaintiff or her physicians (or to adequately warn Plaintiff or his physicians of the above risk), the prosthesis was contaminated due to faulty manufacturing processes;

*Unreasonable Dangerousness*

6.      The manufacturing and marketing defects rendered the Trident acetabular cup unreasonably dangerous by making the Trident acetabular cup dangerous to an extent beyond that which would be contemplated by the ordinary consumer with the knowledge common to the community as to its characteristics.

*Producing Cause*

7.      The above defects, or any of them, were producing causes of Plaintiff's injuries and damages, more particularly set forth below.

COUNT TWO

1.      Plaintiff adopts by reference each and every Paragraph of the "Parties," "Jurisdiction," "Venue," "Statement of Facts Applicable to All Counts," and "Count One" of this Complaint as if fully copied and set forth at length herein.

2.      Defendants owed Plaintiff a duty of reasonable care. Defendants owed Plaintiff a duty to exercise care to discover dangerous qualities and characteristics present in the Trident acetabular cup as a result of manufacturing flaws and a deficiency of quality control. Defendants owed Plaintiff a duty to exercise ordinary care in the production (manufacture) and sale (marketing) of the hip prostheses.

3.      Defendants breached the duties it owed to Plaintiff, failed to exercise ordinary care, and was negligent in the following particulars, among others:

   (a)      manufacturing and marketing the Trident acetabular cup when it contained residuals in violation of the FDA requirements and standards as set forth and describe above in the Statement of Facts and Count One;

     (b)     placing the Trident acetabular cup into the stream of commerce when it contained unsafe manufacturing residuals;

     (c)     placing a hip prosthesis into the stream of commerce that was not sterile;

     (d)     manufacturing a hip prosthesis that was not sterile;

     (e)     failing to warn consumers in general, and Plaintiff or her physicians specifically, of the risk that the hip prostheses could become loose because it contained manufacturing residuals that impeded boney ingrowth;

4.     Each and every one of the foregoing acts or omissions, taken singularly or in any combination, proximately caused Plaintiff's injuries and damages, more particularly set forth below. permitted to infer Defendants' negligence.

<u>COUNT THREE</u>

For breach of express warranty cause of action against Defendants, Plaintiff says:

1.     Plaintiff hereby adopts and realleges each and every Paragraph of the Statement of Facts Applicable to All Counts of this Complaint as if fully copied and set forth at length herein.

2.     Defendant made one or more of the following affirmations of fact or promise, among others, to Plaintiff (or to Plaintiffs physician as an agent of Plaintiff; or to the public generally of which the Plaintiff is a part) which related to the hip prosthesis which became a part of the basis of the bargain:

     (a)     that the acetabular cup would be sterile;

     (b)     that the acetabular cup would not have a high level of adulterants or contaminants upon it following manufacture;

     (c)     that the acetabular cup would not have a high propensity of poor bone fixation; and

     (d)     that the acetabular cup would be safe and effective.

11

3.      The following descriptions of the acetabular cup, among others, were made a part of the basis of the bargain (which, thus, created an express warranty that the hip prosthesis would conform to such description):

    (a)   that the acetabular cup would be sterile;

    (b)   that the acetabular cup would not have a high level of adulterants or contaminants upon it following manufacture;

    (c)   that the acetabular cup would not have a high propensity of poor bone fixation; and

    (d)   that the acetabular cup would be safe and effective.

4.      The acetabular cup breached the above express warranties in the following particulars, among others:

    (a)   that the acetabular cup would be sterile;

    (b)   that the acetabular cup would not have a high level of adulterants or contaminants upon it following manufacture;

    (c)   that the acetabular cup would not have a high propensity of poor bone fixation; and

    (d)   that the acetabular cup would be safe and effective.

5.      Plaintiff notified Defendant of the breach of the above express warranties within a reasonable time after Plaintiff discovered, or should have discovered, such breaches.

6.      The foregoing breaches of warranties proximately caused Plaintiffs injuries and damages, more particularly set forth below.

## COUNT FOUR

For breach of implied warranty of merchantability cause of action against Defendants, Plaintiff says:

1.      Plaintiff hereby adopts and realleges each and every Paragraph of the Statement of Facts Applicable to All Counts of this Complaint as if fully copied and set forth at length herein.

2.      Defendant is a merchant with respect to the acetabular cup and other components used in Plaintiff's hip replacement.

3.      Defendant has not excluded or modified the implied warranty of merchantability.

4.      The acetabular cup and other components used in Plaintiff's hip replacement were not merchantable for the following reasons, among others:

{a}            it was not fit for the ordinary purposes for which hip prostheses are used.

5.      For the foregoing reasons, acetabular cup and other components used in Plaintiff's hip replacement breached the implied warranty of merchantability.

6.      Plaintiff notified Defendant of the above breach of the implied warranty of merchantability within a reasonable time after Plaintiff discovered, or should have discovered, such breach.

7.      The foregoing breach of warranty proximately caused Plaintiff's injuries and damages, more particularly set forth below.

## COUNT FIVE

For breach of implied warranty of fitness for a particular purpose cause of action against Defendants, Plaintiff says:

13

1.      Defendant, at the time of the sale of the acetabular cup and other components used in Plaintiff's hip replacement, had reason to know the particular purpose for which the hip prosthesis was required.

2.      Defendant also knew at such time that Plaintiff was relying on Defendant's skill or judgment to select or furnish a suitable acetabular cup and other components used in Plaintiff's hip replacement.

3.      Defendant did not exclude or modify the implied warranty of fitness for a particular purpose.

4.      The acetabular cup and other components used in Plaintiff's hip replacement were not fit for the particular purpose for which Plaintiff required it.

5.      For the foregoing reasons, the acetabular cup and other components used in Plaintiff's hip replacement breached the implied warranty of fitness for a particular purpose.

6.      The foregoing breach of warranty proximately caused Plaintiff's injuries and damages, more particularly set forth below.

<u>COUNT SIX</u>

For Texas Deceptive Trade Practices Act (DTPA) cause of action against Defendants, Plaintiff says:

1.      Plaintiff adopts by reference each and every Paragraph of the "Parties," "Jurisdiction," "Venue," "Statement of Facts Applicable to All Counts," "Count One" and "Count Two" of this Complaint as if fully copied and set forth at length herein.

2.      Plaintiff, or her physicians on his behalf, sought or acquired by purchase the Trident acetabular cup.

14

*False, Misleading or Deceptive Act or Practice*

        3        Defendants, any or all of them, used or employed one or more of the following deceptive acts or practices, among others:

     (a)    representing that the Trident acetabular cup had characteristics, ingredients, uses or benefits it did not have in that it contained excess residues and impurities;

     (b)    failing to disclose information, that it contained excess residues and bacteria with the intent to induce consumers in general, and Plaintiff or her physicians specifically, into a transaction, and Plaintiff or her physicians specifically, would not have entered into it if Defendant had disclosed the information.

        4.        Plaintiff, or her physicians on his behalf, relied on the above representation, failure to disclose, or both, to Plaintiff's detriment.

*Breach of Warranty*

        Defendants breached one or more of the following express or implied warranties, among others:

     (a)    the implied warranty of merchantability:

        (1)    Defendants, any or all of them, sold the Trident acetabular cup to Plaintiff, or to her physicians on her behalf;

        (2)    The Trident acetabular cup was unmerchantable in being unfit for its ordinary purposes. The Trident acetabular cup lacked something necessary for adequacy in that it failed to accomplish the purposes for which it was manufactured, or in being constructed in a manner that rendered it unreasonably dangerous.

*Producing Cause*

        6        The foregoing conduct was a producing cause of Plaintiff's injuries and damages, more particularly set forth below.

15

*Knowing Conduct*

7.      Defendants engaged in the foregoing conduct knowingly.

8.      Defendants were actually aware, at the time of the above conduct, of the falsity, deception, or unfairness of such conduct. TEX.. Bus. & Comm. CODE § 17.45(9).

9.      Defendants were actually aware of the act, practice, condition, defect, or failure constituting the breach of warranty. TEX. Bus. & Comm. CODE § 17.45(9).

*Intentionally*

10.     Defendants were engaged in the foregoing conduct intentionally.

11.     Defendants were actually aware of the falsity, deception, or unfairness of the above conduct, or the condition, defect, or failure constituting a breach of warranty, and specifically intended that Plaintiff, or his physicians on his behalf, act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness. TEX. Bus. & COMM. CODE § 17.45(13).

12.     Defendants acted with flagrant disregard of prudent and fair business practices to the extent that the defendant should be treated as having acted intentionally. TEX. Bus. & COMM. CODE § 17.45(13).

*Application to Claims for Bodily Injury or Mental Anguish*

13.     The DTPA applies to claims for bodily injury and mental anguish to the extent set forth in Section 17.50(b) and (h). TEX. Bus. & COMM. CODE § 17.49(e).

14.     Section 17.50(b) of the Texas Business and Commerce Code provides, in pertinent part, as follows:

(b) In a suit filed under this section, each consumer who prevails may obtain:

16

(1) The amount of economic damages found by the trier of fact. If the trier of fact finds that the conduct of the defendant was committed knowingly, the consumer may also recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of economic damages; or if the trier of fact finds the conduct was committed intentionally, the consumer may recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of damages for mental anguish and economic damages;

TEX. Bus. & Comm. CODE § 17.50(b).

15.     Thus, pursuant to TEX. Bus. & Comm. CODE § 17.50(b), Plaintiff may recover:

    (1)     his economic damages;

    (2)     since Defendants acted knowingly, damages for mental anguish and three times the amount of economic damages;

    (3)     Since Defendants acted intentionally, damages for mental anguish, three times the amount of economic damages, and three times the amount of damages for mental anguish.

16.     Section 17.45(11) of the Texas Business and Commerce Code defines economic damages as follows:

(11) "Economic damages" means compensatory damages for pecuniary loss, including costs of repair and replacement. The term does not include exemplary damages or damages for physical pain and mental anguish, loss of consortium, disfigurement, physical impairment, or loss of companionship and society.

Thus, Plaintiff may recover for his pecuniary loss, including the costs of repairing or replacing the

defective Trident acetabular cup.

17.     Pecuniary loss includes money and everything that can be valued in money. *Kneip*

*v. Unitedbank-Victoria,734* S.W.2d 130, 134 (Tex.App. - - Corpus Christi 1987, no writ).

18      Under Section 17.50(b), Plaintiff can also recover for mental anguish damages as well as discretionary additional damages, since Defendant engaged in the complained of conduct either knowingly or intentionally.

## Damages Applicable to All Counts

1.      Plaintiff adopts by reference each and every Paragraph of the Statement of Facts Applicable to All Counts of this Complaint as if fully copied and set forth at length herein.

2.      Plaintiff hereby adopts by reference each and every Count of this Complaint as if fully copied and set forth at length herein.

3.      Plaintiff suffered sustained and incurred, and in reasonable medical probability will suffer, sustain and incur, the following injuries and damages as a producing or proximate result (or both) of Defendants' conduct, the defective hip prostheses, or both, among others:

(a)      physical pain, past and future;

(b)      mental suffering, past and future;

(c)      physical impairment, past and future;

(d)      physical disfigurement, past and future;

(e)      reasonable and necessary medical bills, past and future;

(f)      reasonable and necessary attorneys' fees;

(g)      costs of court.

## Statute of Limitations

Plaintiff first discovered less than two years before the filing of this lawsuit that the acetabular cup had become loose. A reasonable person would not made such discovery until such

time. Thus, the statute of limitations did not commence to running until less than two years before the filing of this lawsuit.

### Application of or Texas Law

Plaintiff hereby gives notice that substantive Texas law may apply to certain of the issues in this lawsuit because Texas may have the most significant relationship to such issues. Thus, Plaintiff may apply Texas law to some issues in this lawsuit.

### Jury Demand

Plaintiff requests trial by jury.

### Prayer

Plaintiff prays that Defendants be cited to appear herein, and that upon final trial, Plaintiff have judgment against Defendants for the following, among other things:

1.  Compensatory damages in an amount above the minimum jurisdictional limits of the Court;

2.  Pre judgment interest according to Texas law;

3.  Post-judgment interest according to Texas law;

4.  Costs of court;

5.  Such other and further relief to which Plaintiff shows herself justly entitled to receive.

*(Signature of following page)*

19

Respectfully submitted,

**Jules Johnson Law Firm P.L.L.C.**


By: /s/ Sarah S. Doezema
Sarah S. Doezema
State Bar No. 24063259
Fed Bar No. 1039331
405 Main Street, Suite 455
Houston, Texas 77002
Telephone: (713) 229.9997
Facsimile: (281) 501.6777
ATTORNEYS FOR PLAINTIFF
MEL HARRISON